THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TRACY A. McDANIELS, Defendant-Appellant.

Fifth District   No. 5—84—0086

Opinion filed June 26, 1986.

Randy E. Blue and Larry R. Wells, both of State Appellate Defender's
Office, of Mt. Vernon, for appellant.

Kathleen Alling, State's Attorney, of Mt. Vernon (Kenneth R. Boyle,
Stephen E. Norris, and Mark T. Zubor, all of State's Attorneys Appellate
Service Commission, of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

The defendant, Tracy McDaniels, was convicted in a bench trial of
aggravated battery by intentionally causing permanent disfigurement
to Barry Bigsby. She was sentenced to a five-year term of imprison-
ment. While the defendant raises five issues on appeal, we deem it

necessary to address only one, and we reverse on that issue alone.

The instant proceedings arose out of an incident in which the defendant poured hot grease on Barry Bigsby, resulting in third-degree burns to Bigsby's torso and arms. According to Bigsby, although the police had told him not to visit the defendant because of an altercation between the defendant and Bigsby two weeks prior to the instant events, he nevertheless went to the defendant's apartment at about 5:30 a.m. on the morning of June 5, 1983. He testified that he knocked on the door and that defendant let him in. He stated that he and the defendant talked for a while and the defendant performed an act of fellatio upon him. Bigsby testified that he then dozed off on the couch but was suddenly awakened when hot grease was poured on him.

The defendant contends, however, that she was defending herself when she threw the hot grease on Bigsby. It is the defendant's position that Bigsby would have beat her or forced her to succumb to anal intercourse if she had not thrown the grease on him in an attempt to escape. According to the defendant, she had reason to believe this because two weeks prior to the instant occurrence, she and Bigsby had argued over a curl activator and eight-track tape which were hers but which Bigsby wanted to take. She testified that on that occasion Bigsby had pushed her and she had fled into the bathroom, whereupon he kicked in the bathroom door and began hitting her in the head. With the help of her son, the defendant managed to run out of the bathroom and out the front door of her apartment with Bigsby in close pursuit. When he caught her in the hallway, he hit her in the stomach and face and kicked her in the ribs, causing bruising and swelling of her face and continuing pain in her ribs.

The defendant testified that on the morning she threw grease on Bigsby, she had been playing cards with friends in her apartment building and arrived home at about 5 a.m. About 5:30 a.m. Bigsby walked in through the unlocked front door of her apartment and locked the deadbolt behind him. She said that he took off his suit coat, hung it on the rocking chair and placed an eight-track tape in the stereo. She testified that she then told Bigsby that he was not supposed to be there and he said he was not there. According to the defendant, she asked Bigsby to leave, whereupon he began talking about sex, asking her to perform an act of fellatio on him and to bend over in front of the window so that he could have anal intercourse with her. The defendant testified that she refused him but that he asked her again to bend over. She testified that after she asked him to leave at least twice more, he put his penis back in his pants and sat

down on the couch. The defendant said that she then started gathering trash in the apartment and was getting angry because Bigsby wouldn't leave. He had put his feet up and appeared comfortable on the couch. She again asked him to leave but thought he was getting mad because he had told her two weeks before that while she might pay the rent, he could come and go as he pleased. According to the defendant, after she asked Bigsby to leave several more times, she turned on the burner underneath a pan of grease in which she had cooked pork chops the night before. When he again refused her request to leave, the defendant went back to the kitchen, took the pan of hot grease and set it on her bedroom floor. She explained that she did this just in case she needed it to defend herself. The defendant testified that she then returned to the front room and asked Bigsby if he was going to leave. She said that he shook his head, no, and she knew that if she continued to ask him to leave, there would be a "big fight," meaning that she would get whipped again. At some point, she placed the trash next to the front door, unlocked the door and possibly opened it, whereupon Bigsby heard the sound and looked over at her. She testified that if she had tried to run out the door he would have caught her and beat her like before, so when it got to the point that, "I was going to get hurt and he was going to get hurt," she threw the grease on him and ran out of the apartment with Bigsby screaming in pain behind her. She called the police from another apartment since she had no phone, and another neighbor took Bigsby to the hospital. She testified that she knew she had hurt Bigsby, but did not realize at the time how badly he had been hurt. She was still afraid that he would get her at the time she called the police. The defendant testified that she believed she had had to throw the grease on Bigsby in order to avoid submission to anal intercourse or another beating. She said that she did not attempt to leave the apartment in order to call the police prior to throwing the grease on Bigsby because she was afraid that he would chase her again and beat her. The defendant also testified that she knew Bigsby carried a gun although she did not know if he had it with him at that time.

It was the defendant's theory of the case, therefore, that she had been defending herself by the act of throwing the grease on Bigsby. She believed that she could not induce Bigsby to leave her apartment nor could she herself leave without suffering another beating or submitting to anal intercourse unless she in some way deterred Bigsby.

The defendant's attorney had begun cross-examining the first witness to testify for the State, Bigsby, in an attempt to elicit information from him concerning the prior altercation, when the State ob-

jected to the introduction of such evidence. The trial court did not rule on the objection, but, as the trier of fact, made the following remark:

> "Seems to be pretty ridiculous to claim self-defense. You might do that before a jury, but this is a bench trial."

This remark was made at page 20 of a 105-page report of proceedings, and was made before any evidence of self-defense, other than the prior altercation between the parties, had been presented. Moreover, the witness who was being cross-examined at the time these remarks were made was the victim, Barry Bigsby, whose very involvement in the crime as the alleged victim would indicate his testimony would be biased against the defendant.

These facts make it plainly apparent that the trial court, as the trier of fact, had prejudged the validity of the defendant's defense prior to hearing the totality of the evidence. At the time the court stated that the claim of self-defense was "pretty ridiculous," the court had not only not heard all of the evidence to be presented by the defendant, it had not even heard the completion of the testimony of the first witness to testify for the State.

■■ ■ The right of a defendant to an unbiased, open-minded trier of fact is so fundamental to our system of jurisprudence that it should not require either citation or explanation. It is rooted in the constitutional guaranty of due process of law (see *People v. Diaz* (1971), 1 Ill. App. 3d 988, 992, 275 N.E.2d 210, 212), and entitles a defendant to a fair and impartial trial before a court "which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial" (*City of Chicago v. Cohn* (1927), 326 Ill. 372, 374, 158 N.E. 118, 120). It is axiomatic that "[p]re-judgment is the antithesis of a fair trial." (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 992, 275 N.E.2d 210, 212.) These standards of impartiality apply to both judges and juries; one does not waive his right to an impartial trial by waiving his right to a jury. (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 993, 275 N.E.2d 210, 213.) If this most basic and fundamental right is not afforded a defendant during trial, that defendant had been denied due process of law and is entitled to a new trial. *People v. Diaz* (1971), 1 Ill. App. 3d 988, 993, 275 N.E.2d 210, 213.

■ The doctrine of plain error as required for reversal may be invoked where the evidence is closely balanced or where the error is of such a magnitude that the accused is denied a fair and impartial trial. (*People v. Gacy* (1984), 103 Ill. 2d 1, 28, 468 N.E.2d 1171, 1181.) We believe that the trial judge's premature and clearly biased remarks denied the defendant a fair and impartial trial. The fact that the court

subsequently allowed the defendant to present her theory of the case does not diminish the magnitude of the error. (See *People v. Ojeda* (1969), 110 Ill. App. 2d 480, 249 N.E.2d 670.) While the State attempts to explain the remarks by arguing that the court was merely stating its belief that a prior altercation, by itself, would not be sufficient for the defendant to claim self-defense, after careful consideration of the remarks in context, we are not persuaded that this was the case. The judge was not advising defense counsel that more evidence was required; he had no reason to believe that the prior altercation was the only evidence of self-defense that was to be offered. His remarks came very near the beginning of the trial, at defense counsel's first opportunity to present any evidence of its theory of the case. (See *People v. Ojeda* (1969), 110 Ill. App. 2d 480, 249 N.E.2d 670.) It is evident that the judge was evaluating the merit of the defense even before that defense had been presented and at a time when the only evidence before the court was the direct examination of the alleged victim.

We conclude, therefore, that the defendant was denied a fair and impartial trial, and for this reason, we reverse and remand for a new trial on the grounds of plain error.

Reversed and remanded.

KARNS and WELCH, JJ., concur.